**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO.  19-688** |
| | : | |
| **CHARLES SALLEY** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                      **November 30, 2020**

We must investigate and deter those who threaten the safety of witnesses testifying in our criminal trials.  Intimidating witnesses with threats of violence and felons possessing guns are serious crimes.  We must also be mindful of the health of persons awaiting trial in our federal prisons particularly in the COVID-19 pandemic. We return today to a pretrial detainee's third request for pretrial release as he is now facing serious medical risks with repeated hospitalizations unable to be addressed in a prison now facing a COVID-19 outbreak.  The dramatically changed circumstances mandate we change our earlier view and release him to strict home incarceration conditions pending his upcoming trial on threatening witnesses and possessing a gun as a felon.

Our grand jury charged Delawarean Charles Salley with threatening a trial witness in a criminal trial in our District with physical harm and with possessing a gun as a convicted felon. The grand jury found he tried to alter the truth finding process. He faces a mandatory minimum sentence of fifteen years if found guilty.  First incarcerated over a year ago at Federal Detention Center Philadelphia, he awaits trial originally scheduled for January 2020.  He is now set for his jury trial on February 23, 2021 following several continuances required by COVID-19 mitigation.

Mr. Salley has a serious medical history for a young man.  He recently tested positive for COVID-19 and returned from the hospital for kidney illness. He is now back in the hospital as of

the most recently filed medical records.  He moves for pretrial release for the third time since the onset of COVID-19 in our federal prisons. In April and May 2020, Mr. Salley argued his medical history, including a history of kidney disease, hypertension, and asthma, constituted a compelling reason for his pretrial release considering the risk of COVID-19. We denied Mr. Salley's previous motions without prejudice. While we agreed Mr. Salley's significant medical history placed him in the "highest risk category" for severe illness or death from COVID-19, we found Mr. Salley failed to demonstrate a compelling reason for his release because the Detention Center had not yet reported a positive case and demonstrated the efficacy of its mitigation efforts.  We further found the potential danger Mr. Salley posed to the community then outweighed reasons for his release because we could not reach a comfort level in monitoring given early varied advices on COVID-19 mitigation asked to be applied by pretrial officers. We allowed Mr. Salley to move again for pretrial release should he demonstrate deterioration in mitigation steps, care, or his health.

Mr. Salley has now shown dramatic changes warranting his pretrial release subject to home incarceration with strict monitoring. His health significantly worsened. He recently tested positive for COVID at the Detention Center.  Infection while incarcerated with potential recovery from COVID for a healthy man may not warrant pretrial release.  But Mr. Salley has been in and out of the hospital for acute kidney transplant rejection in the last month. The most recent records confirm emergency room treatment in the last week. The Detention Center is facing a COVID-19 outbreak and does not appear able to adequately address Mr. Salley's increasingly dire medical condition at this stage. Strict home incarceration conditions with the benefit of much more experience substantially reduce the risks presented by his pretrial release until our February 2021 trial.

## I.     Background

### A.     Mr. Salley's charged conduct.

Our grand jury indicted Mr. Salley for witness tampering and possessing a gun by a felon.[1] A special agent from the Federal Bureau of Investigation swore Mr. Salley sent a witness in a federal criminal trial a handwritten letter which the special agent swore, from his knowledge and experience, included threats meant to intimidate the witness.[2] A subsequent search executed of Mr. Salley's home revealed a firearm with an obliterated serial number and two magazines.[3] Federal law prohibits Mr. Salley from possessing firearms because of his six prior felony convictions, including for three drug trafficking crimes between 2001 and 2006, unlawful gun possession in 2006, carrying a firearm without a license in 2006, and theft by unlawful taking in 2006.[4] Mr. Salley admitted to writing and sending the letter and possessing a firearm in his home.[5]

Judge Lynne Sitarski ordered Mr. Salley detained pending trial on November 14, 2019.[6] We originally scheduled trial on Mr. Salley's indictment beginning on January 27, 2020.[7] Due to various continuances, Mr. Salley's trial is now scheduled to begin on February 23, 2021, although it is unclear whether we will be able to proceed on this date due to the current public health crisis.[8]

### B.     COVID-19 affecting persons working or incarcerated at the Detention Center.

Mr. Salley explains the Detention Center recently experienced a COVID-19 outbreak among its population of inmates and staff. As we understand today from our own review, COVID-19 is a respiratory disease spreading mainly through droplets produced when an infectious person, even one who is asymptomatic, talks, coughs, or sneezes.[9] The virus can also be spread through the air.[10] The practice of social distancing – or staying six feet away from others – can reduce the spread of the virus.[11]

COVID-19 poses a serious global public health risk. As of November 30, 2020, the Centers for Disease Control and Prevention reported a total of 13,142,997 cases of COVID-19 in the United States with 265,166 total deaths caused by the virus.[12] People of any age with the following conditions *are* at increased risk of severe illness from COVID-19: cancer; chronic kidney disease; COPD (chronic obstructive pulmonary disease); immunocompromised state (weakened immune system) from solid organ transplant; obesity (body mass index [BMI] of 30 kg/m2 or higher); serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies; sickle cell disease; pregnancy; a history of smoking; and Type 2 diabetes mellitus.[13]  People of any age with the following conditions *might* be at an increased risk for severe illness from COVID-19: asthma (moderate-to-severe); cerebrovascular disease (affects blood vessels and blood supply to the brain); cystic fibrosis; hypertension or high blood pressure; immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; pregnancy; pulmonary fibrosis (having damaged or scarred lung tissues); neurologic conditions (like dementia); liver disease; a body mass index greater than 25 kg/m2; pulmonary fibrosis; Thalassemia (a type of blood disorder); and Type 1 diabetes mellitus.[14]

The Center for Disease Control tells us COVID-19 can result in a variety of short-term and long-term health effects lasting for weeks or even months after recovery from acute illness.[15] While the relative novelty of the virus means we do not yet have a full picture of all long-term effects, the Center reports "[e]ven people who are not hospitalized and who have mild illness can experience persistent or late symptoms" including shortness of breath and chest pain to more severe complications like lung function abnormalities and acute kidney failure.[16]

The potential for reinfection is also not yet fully understood by medical experts.[17] Due to this lack of knowledge, the Center recommends wearing a mask, social distancing, washing hands, and avoiding crowded or confined spaces for those who tested positive.[18] There have been some isolated reports of reinfected individuals across the globe, including in the United States.[19] An Oxford study published last week ahead of peer review suggests people who contracted COVID-19 are unlikely to contract the disease again for at least six months.[20]

Mindful correctional facilities face unique challenges in controlling the transmission of COVID-19, the Centers for Disease Control issued guidance to prisons and correctional facilities to help them prevent the spread of COVID-19.[21] Following this guidance, the Bureau of Prisons adopted aggressive safety measures, assuring "maintaining safety and security of [its] institutions is [its] highest priority."[22] We are aware the Detention Center adopted a variety of safety measures including suspending social visitation, limiting inmate movement, screening all persons who enter the facility, testing and quarantining all new commitments to the facility and modifying operations within the housing center. While these measures may have initially slowed the spread of the virus, the Detention Center unfortunately suffered a recent outbreak. We understand the Detention Center reported eighty-nine inmates and twenty-one staff members tested positive for COVID-19 cases in the last week. This represents almost ten percent of the Detention Center's over 900 total inmates.

**C.      Mr. Salley's health concerns.**

Mr. Salley suffers from a variety of medical conditions including hypertension, hyperlipidemia or high cholesterol, asthma, and history of a heart attack and stroke in July 2014.[23] He also has a history of renal disease for which he underwent dialysis for three years.[24] In March 2019, Mr. Salley received a kidney transplant without complications.[25] Since his transplant, Mr.

Salley has been on immunosuppressive therapy consisting of tacrolimus, mycophenolate, and prednisone, although he has reported non-compliance with the morning doses of those medications.[26]

Late last month, the Detention Center hospitalized Mr. Salley for increased levels of creatinine, a waste product normally filtered out of the body by the kidneys.[27] The hospital diagnosed Mr. Salley with Banff type IIA acute cellular rejection of his transplanted kidney and discharged him a few days later with new medications.[28] We understand acute kidney rejection is associated with increased risk of longer-term kidney failure and death.[29] Mr. Salley's discharge summary also includes a new diagnosis for steroid-induced Type 2 diabetes mellitus.[30]

Mr. Salley then tested positive for COVID-19 on November 12, 2020.[31] From November 14 through November 18, Mr. Salley's medical records represent he presented as asymptomatic and denied experiencing cough, fatigue, body or muscle aches, or other symptoms.[32] On November 19, Mr. Salley stated he experienced nausea, diarrhea, and chills but originally concealed his symptoms because he wanted to leave isolation.[33] He further reported experiencing body aches and extreme fatigue on November 19.[34] The next day, Mr. Salley stated he still felt tired, but was feeling much better overall and requested to be let out of isolation.[35] The most recent medical record as of November 24 represents Mr. Salley's kidney transplant team at the Hospital of the University of Pennsylvania recommended he be taken to the emergency room for "worsening symptoms" and increased creatinine levels.[36]

Mr. Salley has also manifested a change in outlook and mental acuity while his physical health has deteriorated while incarcerated affecting both his and his counsel's ability to proceed at times. Despite being represented, Mr. Salley has filed various *pro se* letters, often directed at his counsel, in which he makes various demands for property and money,[37] requests his counsel

"check the clerk's file for a bond and bond the charges,"[38] and accuses him of prosecutorial misconduct.[39] These letters raising issues unrelated to our criminal justice system evidence Mr. Salley's impaired understanding of the role of his counsel and the significance of the grand jury's charges. While we understand his counsel is diligently working to advise and control his client's rambling thoughts, we are mindful counsel will have more direct access to Mr. Salley if he is no longer in the quarantine unit or under necessary lockdowns in the Detention Center. This concern is not grounds for pretrial release by itself but we trust his counsel will be able to better address Mr. Salley's concerns and focus his defense.

### D. COVID-19 in kidney transplant patients.

As the World's understanding of COVID-19's effects on vulnerable populations evolve, we continually review updated research as best as we can. Earlier this year, the New England Journal of Medicine published a study from Montefiore Medical Center in New York which concluded kidney transplant recipients appear to be at "particularly high risk for critical COVID-19 illness due to chronic immunosuppression and coexisting conditions."[40] The study identified thirty-six adult kidney transplant recipients with a median age of sixty who tested positive for COVID-19. Of the thirty-six recipients, ninety-four percent had hypertension and sixty-nine percent had diabetes mellitus. Thirty-five of the patients were receiving tacrolimus, thirty-four were receiving prednisone, and thirty-one were receiving mycophenolate mofetil or mycophenolic acid, the same anti-rejection medications Mr. Salley is currently taking.

Twenty-eight of the thirty-six recipients, or seventy-eight percent, were admitted to the hospital. A follow up three weeks later revealed that ten of the thirty-six recipients had died. The study concluded there is a "very high early mortality among kidney-transplant recipients with Covid-19 — 28% at 3 weeks as compared with the reported 1% to 5% mortality among patients

with Covid-19 in the general population who have undergone testing in the United States and the reported 8 to 15% mortality among patients with Covid-19 who are older than 70 years of age."

A study published by the Journal of the American Society of Nephrology last month substantiates Montefiore's findings of this elevated risk.[41] This study enrolled 1,216 kidney transplant recipients in France, sixty-six of whom tested positive for COVID-19. Of the sixty-six patients who had COVID-19, twenty-four percent died. The study concluded "[p]atients with kidney transplants display a high risk of mortality. Non-White ethnicity and comorbidities such as obesity, diabetes, asthma, and chronic pulmonary disease were associated with higher risk of developing COVID-19 disease."

### E. Mr. Salley's plans upon release.

If granted pretrial release, Mr. Salley plans to live with his wife and four children in their Clayton, Delaware home.[42] Mr. Salley agrees to home confinement with electronic monitoring and numerous conditions, including restricting his travel only to this courthouse and the District of Delaware.[43]

## II. Analysis

Mr. Salley moves for pretrial release under Congress' safety valve in the Bail Reform Act provision, 18 U.S.C. § 3142(i), which allows us to reexamine Mr. Salley's detention pending trial "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."[44] Mr. Salley argues his recent hospitalization for rejection of his kidney transplant, combined with the recent COVID-19 outbreak at the Detention Center, constitutes a compelling reason for his release.[45] He further argues his temporary release is necessary to prepare his defense, as the Detention Center has not allowed Mr. Salley's counsel to consult with Mr. Salley regarding his case.[46] The United States

opposes Mr. Salley's release, arguing his various medical conditions and recent COVID-19 diagnosis are under control in prison and therefore do not constitute a compelling reason for his release; even if they are compelling reasons, the United States argues Mr. Salley is a flight risk and a danger to the community.[47]

Congress, through the Bail Reform Act, "mandates the release of individuals so long as the court can be reasonably assured the defendant does not pose a flight risk or danger to the community."[48] If "conditions, or a combination of conditions, can be fashioned to reasonably provided such assurances, the individual must be released."[49] Detention is "the carefully limited exception."[50]

To evaluate whether a compelling reason for Mr. Salley's release exists now, we must evaluate the unique circumstances of Mr. Salley's case within the context of the COVID-19 pandemic. Our Court of Appeals instructs "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify…release."[51] Courts evaluating motions for release under Section 3142(i) in this ongoing COVID-19 era typically evaluate four factors: the specificity of the petitioner's stated COVID-19 concerns, the original grounds for the petitioner's pretrial detention, the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the petitioner, and the likelihood that the petitioner's proposed release would increase COVID-19 risks to others.[52] Consistent with these requirements, courts have generally granted motions for release during this global pandemic where the petitioner adduces evidence of a particularized risk of severe illness from the virus.[53] They have conversely denied motions based on a generalized fear of contracting the virus where petitioner lacks any medical vulnerabilities.[54]

Evaluating Mr. Salley's motion involves two steps. We must first determine whether Mr. Salley's severe health conditions in the face of the COVID-19 pandemic constitute a "compelling reason" for his release from the Detention Center today under section 3142(i). We must then apply the factors Congress identified in section 3142(g) to determine if we can construct conditions of release to reasonably assure the appearance of Mr. Salley at trial and the safety of any other person and the community.

    **A.**    **Mr. Salley's proven vulnerable medical state, especially considering the Detention Center's recent outbreak, constitutes a compelling reason for his release.**

Mr. Salley argues his recent kidney transplant complications, positive COVID-19 test, and the increase in COVID-19 cases within the Detention Center population generally constitute a change of circumstances from the time we denied his previous motions. We agree. We found in April, and continue to find, Mr. Salley's medical conditions increase his risk of severe illness from COVID-19. We now also find Mr. Salley's fears of contracting COVID-19 at the Detention Center are no longer hypothetical, as he, among numerous other inmates, has tested positive for the virus.

    **1.**    **Mr. Salley, having contracted COVID-19, is still a medically vulnerable prisoner.**

Mr. Salley's illnesses have only worsened since we found him to be at the "highest risk" of severe illness of COVID-19 earlier this year.[55] In addition to his asthma, high blood pressure, and history of kidney disease for which he takes immunosuppressants, Mr. Salley's medical records now show he is suffering from acute rejection of his kidney transplant, steroid-induced diabetes, and most recently, COVID-19.

As we noted in our April 28, 2020 opinion, medical professionals recognize each of Mr. Salley's medical conditions as increasing risk of severe illness from COVID-19. Regarding Mr. Salley's history of kidney disease, his transplant, and current immunosuppression therapy, the

Mayo Clinic notes "[b]ecause end-stage organ disease and immunosuppression post-transplant weakens the body's immune system, pre- and post- transplant patients are among those at higher risk of severe illness from COVID-19."[56]  Studies of kidney transplant patients further demonstrate a significantly higher mortality rate among this immunocompromised population: twenty-four to twenty-eight percent compared to between one percent and five percent in the general population. Complications he is suffering from acute rejection of his transplant presumably exacerbates this already-increased risk. The Center for Disease Control also reports an increased risk of severe illness from COVID-19 for individuals suffering from Type II diabetes, moderate to severe asthma, and high blood pressure.[57]

Courts have granted release to petitioners suffering from similar ailments, recognizing the high risk of severe illness posed by COVID-19. Judge Slomsky, for example, granted pretrial release to a petitioner suffering from chronic asthma who had been charged with possession of a firearm by a felon, possession with intent to distribute controlled substances, and possession of a firearm in furtherance of a drug trafficking crime.[58] Judge Slomsky found the petitioner's chronic asthma to be a compelling reason for release because, despite being prescribed a variety of medications to treat the asthma, it remained somewhat uncontrolled at the Detention Center and petitioner sought emergency treatment for his asthma on various occasions.[59] He further found petitioner's release plans would significantly reduce his risk of contracting COVID-19 relative to living in close quarters with other Detention Center inmates.[60]

We also cannot credit theories Mr. Salley's increased risk of severe illness is somehow mitigated after testing positive for COVID-19 two weeks ago. His medical records seem to indicate he has not yet experienced severe complications from the virus. No one disputes, however,

symptoms may persist for weeks – even months – in individuals who contracted the virus. This risk is especially true for medically vulnerable individuals like Mr. Salley.

Even assuming Mr. Salley effectively "recovered" from COVID-19, courts have granted release based on the uncertain potential for reinfection. Earlier this month, for example, Chief Judge Mueller granted compassionate release to a petitioner who argued his history of asthma, hepatitis B, and obesity made him susceptible to serious complications from potential COVID-19 reinfection, combined with the recent COVID-19 outbreak at his prison, constituted extraordinary and compelling reasons for his early release.[61] The petitioner tested positive for COVID-19 almost four months before moving for release and had since "recovered."[62] Judge Mueller explained the lack of knowledge regarding reinfection and courts are divided on the issue, with some courts opting to "err on the side of caution to avoid potentially lethal consequences" for petitioner because "simply announcing that an inmate has recovered does not mean [petitioner] is completely safe from the virus."[63] She concluded petitioner's heightened risk of COVID-19 reinfection constituted an extraordinary and compelling reason for release because of "the high level of infection at [petitioner's prison], the lack of scientific certainty regarding whether reinfection is possible after a purported recovery or negative test, or whether any COVID-19 immunity lasts for a meaningful period of time, coupled with defendant's prior infection and his multiple health conditions."[64]

In *United States v. Bandrow*, Judge Leitman similarly granted compassionate release to a petitioner who argued his asthma, epilepsy, and recent diagnosis of hematuria (presence of blood in his urine) increased his risk of severe illness from COVID-19 and constituted extraordinary and compelling reasons for his release from a prison experiencing a COVID-19 outbreak.[65] The petitioner tested positive for COVID-19 while his motion was pending.[66] In granting compassionate release to a convicted felon, Judge Leitman rejected the United States' arguments

of testing positive for COVID-19 mitigates the petitioner's risk. Judge Leitman did not credit a lack of serious post-COVID serious complications.[67] He instead cited the lack of knowledge regarding reinfection, finding "there remains a serious question whether he remains at risk of becoming reinfected with COVID-19 and suffering significant health consequences as a result."[68]

As we found in denying his earlier motions for pretrial release in April and May 2020, Mr. Salley remains in the highest risk category for severe illness or death from COVID-19. He tested positive for the virus almost two weeks ago and, as far as we can tell, has fortunately only exhibited some minor symptoms so far. Our medical experts tell us, however, individuals who test positive may exhibit serious symptoms weeks and months after an initial diagnosis. They may even become reinfected at some point. We cannot ignore the significant risks Mr. Salley faces in the Detention Center – which is currently experiencing an outbreak – given his vulnerable state.

### 2. The Detention Center's recent COVID-19 outbreak puts Mr. Salley at risk.

We face a very different picture of COVID-19 at the Detention Center compared to when we previously denied Mr. Salley's motion. In April, we found Mr. Salley's arguments regarding the Detention Center's failure to follow some protocols, such as properly quarantining new asymptomatic inmates, to lack evidentiary support.[69] The Detention Center had not yet reported a single positive case of COVID-19, though we noted the absence of positive cases could be due to the lack of testing available for asymptomatic prisoners.[70] We found Mr. Salley's fears of contracting COVID-19 to be too speculative at that point in time.

Mr. Salley's fears are no longer hypothetical seven months later. The Detention Center began noting isolated instances of new Detention Center inmates testing positive for COVID-19 a few months ago. Since then, and consistent with our understanding of the highly contagious nature of COVID-19 in confined spaces, this number has grown exponentially. Ten days ago, the Federal

Detention Center reported eighty-nine inmates – nearly ten percent of all inmates – and twenty-one staff members who tested positive for COVID-19. Mr. Salley himself tested positive on November 12, 2020. Given the potentially serious complications Mr. Salley may face in the weeks and months to come, as well as the chance of reinfection, the drastically different circumstances from when we last reviewed Mr. Salley's case warrant his pretrial release.

**B.      Mr. Salley's serious medical conditions now outweigh danger he presents to his community given strict home incarceration conditions.**

Having found Mr. Salley's various medical conditions, when combined with the Detention Center's increased number of COVID-19 cases, constitutes a compelling reason for his temporary release, we must weigh this compelling reason against the section 3142(g) factors. Those factors include the nature and circumstances of the offense charged, including whether it involves controlled substances or firearms; the weight of the evidence against the defendant; the defendant's history and characteristics (including the person's character, physical and mental condition, family ties, criminal history, and record of appearing at court proceedings); whether the person was on probation, parole, or other court supervision at the time of the alleged offense; and the nature and seriousness of the danger to any person or the community posed by the defendant's release.[71] The United States must demonstrate Mr. Salley presents a danger to the community by clear and convincing evidence.[72]

Mr. Salley argues there are conditions of release available which would ameliorate any danger Mr. Salley may pose to the community.[73] The United States argues we should again deny Mr. Salley's Motion because "nothing…has changed" regarding the seriousness of Mr. Salley's crimes and his risk of dangerousness and flight as when we denied his previous motions for release.[74] After carefully considering the applicable factors for a third time in this continually evolving pandemic now at heightened levels, Mr. Salley's significant medical vulnerabilities now

outweigh any danger he may pose to the community based on strict home incarceration conditions imposed upon Mr. Salley's release.

Courts grant pretrial release where the petitioner presents a compelling reason for his release and plans for release would reduce risk of flight or danger to the community. Judge Blake in *United States v. Creek*, for example, granted pretrial release to a petitioner charged with drug trafficking and firearm offenses where petitioner suffered from thoracic spine disease, asthma, hypertension, among other conditions.[75]  Judge Black found the petitioner's increased risk of severe illness from COVID-19 outweighed the potential risk petitioner posed to the community because his release plans reduced his access to drugs and ammunition.[76] In *United States v. Dhavale*, Chief Judge Howell affirmed the grant of temporary release to a petitioner charged with sex trafficking crimes because she found the petitioner's prediabetes and hypertension in light of COVID-19 constituted a compelling reason for his release.[77] She found, despite the section 3142(g) factors weighing in favor of pretrial detention, petitioner's suitable and restrictive release plan with his wife reduced potential danger to the community.[78]

Circumstances have radically changed since Mr. Salley last moved for pretrial release in April and May. Not only are we seeing a much different picture of Mr. Salley's health and COVID-19 risk at the Detention Center, but we also have the benefit of at least seven months of pretrial detainees being released by courts around the country. In contrast to our previous belief Mr. Salley could only be placed on home confinement, we now know Mr. Salley can be placed in home incarceration with strict monitoring in the District of Delaware.  Mr. Salley will always be restricted to his home except for emergency medical care or when his Pretrial Services Officer approves medical appointments and court-ordered obligations. He is required to report to his Pretrial Services Officer and will submit to urinalysis. He will be restricted on the computer and

15

prohibited from being close to guns and ammunition.  These additional restrictions reduce the risk Mr. Salley as a presently ill person may pose to the community between now and our February 2021 trial.[79]

### III.   Conclusion

Charles Salley seeks pretrial release arguing his medical conditions have worsened, demonstrated in part by his recent hospitalization for acute kidney transplant rejection. He further argues the Detention Center recently suffered an outbreak of COVID-19 among both inmates and staff members, greatly increasing Mr. Salley's risk of becoming severely ill given his medical vulnerabilities. Unbeknownst to his attorney, Mr. Salley tested positive for COVID-19 the day before he moved for release.  Less than a week after Mr. Salley tested positive, the United States opposed Mr. Salley's release, arguing Mr. Salley has been asymptomatic and seemingly recovered from the virus. It further argues against Mr. Salley's release because his other medical conditions are being adequately managed and he still poses a danger to the community if released.  We found his last request to be a close call.  The circumstances have dramatically worsened.  We can impose home incarceration and ensure the safety of the community until our February 2021 trial.  We release Mr. Salley to home incarceration under the strict terms in an accompanying Order. Violating this Order may result in immediate return to the Federal Detention Center.

---

[1] ECF Doc. No. 9.

[2] ECF Doc. No. 1 ¶¶ 5-10.

[3] *Id.* ¶ 13.

[4] ECF Doc. No. 5 at 5.

[5] ECF Doc. No. 1 ¶ 12; ECF Doc. No. 19.

[6] ECF Doc. No. 6.

[7] ECF Doc. No. 12.

[8] ECF Doc. No. 68.

[9] United States Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19)*, *Social Distancing* (last updated Nov. 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html.

[10] *Id.*

[11] *Id.*

[12] United States Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19) Data Tracker*, (last updated Nov. 29, 2020), https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days.

[13] United States Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19), People with Certain Medical Conditions*, (last updated Nov. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html).

[14] *Id.*

[15] United States Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19), Long-Term Effects*, (last updated Nov. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html.

[16] *Id.*

[17] United States Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19), Reinfection*, (last updated Oct. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html.

[18] *Id.*

[19] Richard L. Tillet et al., *Genomic evidence for reinfection with SARS-CoV-2: a case study*, Lancet Infectious Diseases (Oct. 12, 2020), https://doi.org/10.1016/S1473-3099(20)30764-7.

[20] Nancy Lapid, *AstraZeneca Vaccine Can Be up to 90% Effective; COVID-19 Reinfection Unlikely for at least Six Months*, U.S. News & World Rep., Nov. 23, 2020, https://www.usnews.com/news/top-news/articles/2020-11-23/astrazeneca-vaccine-can-be-up-to-90-effective-covid-19-reinfection-unlikely-for-at-least-six-months.

[21]United States Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19)*, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated Oct. 21, 2020).

[22]Federal Bureau of Prisons, *Updates to COVID-19 Action Plan*, (last updated Mar. 19, 2020). https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

[23] ECF Doc. No. 74 at 16, 103.

[24] *Id.* at 16.

[25] *Id.*

[26] *Id.* at 14, 16.

[27] *Id.* at 14.

[28] *Id.* at 8.

[29] Philip A. Clayton et al., *Long-Term Outcomes after Acute Rejection in Kidney Transplant Recipients: an ANZDATA Analysis*, 30 J. Am. Soc'y of Nephrology 1697 (Sept. 2019), available at https://doi.org/10.1681/ASN.2018111101.

[30] ECF Doc. No. 74 at 8.

[31] *Id.* at 4.

[32] ECF Doc. No. 76 at 13-17.

[33] *Id.* at 11.

[34] *Id.*

[35] *Id.* at 9.

[36] ECF Doc. No. 78 at 1-3.

[37] *See, e.g.*, ECF Doc. No. 48 at 8-10; ECF Doc. No. 50.

[38] ECF Doc. No. 70.

[39] ECF Doc. No. 55.

[40] Letter from Akalin et al., Montefiore Med. Ctr., to Editor, the New Eng. J. Med. (Apr. 24, 2020), https://www.nejm.org/doi/10.1056/NEJMc2011117

[41] Michelle Elias et al., *COVID-19 Infection in Kidney Transplant Recipients: Disease Incidence and Clinical Outcomes*, 31 J. Am. Soc'y of Nephrology 2413 (Oct. 2020), available at https://doi.org/10.1681/ASN.2020050639.

[42] ECF Doc. No. 69 at 23-24.

[43] *Id.*

[44] 18 U.S.C. § 3142(i).

[45] ECF Doc. No. 69 at 20-23.

[46] *Id.*

[47] ECF Doc. No. 73.

[48] 18 U.S.C. § 3142.

[49] *Id.*

[50] *United States v. Salerno*, 481 U.S. 739, 755 (1987).

[51] *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

[52] *United States v. Grimes*, No. 16-59, 2020 WL 3056060, at *6 (E.D. Pa. June 9, 2020).

[53] *See, e.g., Grimes*, 2020 WL 3056060, at *6-8 (granting motion for pretrial release where petitioner suffered from chronic asthma uncontrolled while in custody at the FDC Philadelphia); *United States v. Somerville*, 463 F. Supp. 3d 585, 597-600 (W.D. Pa. May 29, 2020) (granting compassionate release where petitioner suffered from hypertension, hyperlipidemia, chronic bronchitis, asthma, and obesity and resided in a prison identified as a "hotbed" of COVID-19).

[54] *See, e.g., United States v. Carter*, No. 18-561-1, 2020 WL 3412571, at *7 (denying pretrial release where petitioner's concerns about COVID "lack the particularized vulnerability to COVID-19 needed to constitute a compelling reason"); *United States v. Sterling*, 459 F. Supp. 3d 673, 679 (E.D. Pa. 2020) (denying pretrial release where young petitioner in good health failed to demonstrate an increased susceptibility to severe illness from COVID-19).

[55] ECF Doc. No. 34 at 14.

[56] Mayo Clinic, *COVID-19*, *Specific questions and answers about COVID-19 for transplant patients*, (https://www.mayoclinic.org/patient-visitor-guide/covid-19-faqs/transplant (last visited Nov. 30, 2020).

[57] United States Centers for Disease Control, *Coronavirus 2019 (COVID-19)*, *People with Certain Medical Conditions*, (last updated Nov. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[58] *Grimes*, 2020 WL 3056060, at *6-8.

[59] *Id.* at *6.

[60] *Id.* at *8.

[61] *United States v. Keys*, No. 16-234, 2020 WL 6700412, at *3-5 (E.D. Cal. Nov. 13, 2020).

[62] *Id.* at *3.

[63] *Id.* (citations and quotations omitted).

[64] *Id.* at *4.

[65] *United States v. Bandrow*, --- F. Supp. 3d ---, 2020 WL 4050242, *5-7 (E.D. Mich. July 20, 2020).

[66] *Id.* at *4.

[67] *Id.* at *6.

[68] *Id.*; *see also United States v. McCall*, 465 F. Supp. 3d 1201, 1208 (M.D. Ala. 2020) (granting compassionate release to a petitioner suffering from sickle-cell disease in part because "the evidence reflects that sickle cell patients who have already exhibited life-threatening symptoms of the virus must be protected from the risk of future reinfection").

[69] ECF Doc. No. 34 at 14-15.

[70] *Id.*

[71] 18 U.S.C. § 3142(g).

[72] 18 U.S.C. § 3142(f) ("The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence"); U.S. v. Perry, 788 F.2d 100, 114-15 (3d Cir. 1986) (stating, in dicta, "The judicial officer need only be convinced of dangerousness by clear and convincing evidence… the burden of persuasion ultimately rests upon the United States").

[73] ECF Doc. No. 69 at 23-24.

[74] ECF Doc. No. 73 at 2.

[75] 457 F. Supp. 3d 473, 475-79 (D. Md. May 1, 2020).

[76] *Id.* at 478-79.

[77] No. 19-92, 2020 WL 1935544, at *5-6 (D.D.C. Apr. 21, 2020).

[78] *Id.* at *5.

[79] *See United States v. Smith*, No. 14-20814, 2020 WL 8622831, at *2 (E.D. Mich. Nov. 20, 2020) (granting renewed motion for compassionate release because an alternative release plan and the availability of monitoring software and a rehabilitative program alleviated prior concerns with petitioner's release).